IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JOHN O. MILLER,<br><br>Plaintiff,<br><br>vs.<br><br>CARRIE WALSTED, et al.,<br><br>Defendants. | CV 25-3-H-DWM<br><br>ORDER |

Plaintiff John O. Miller ("Miller"), a state prisoner proceeding pro se, alleges that Defendants Carrie Walsted and Beau Baltezar violated his constitutional rights at Montana State Prison. (Doc. 42 (Third Am. Cmplt.)). Miller filed a motion for partial summary judgment. (Doc. 45.) Defendants have moved for summary judgment themselves. (Doc. 54.) The motions are fully briefed. For the reasons provided below, summary judgment is granted to Defendants. Plaintiff's motion is denied.

## I. BACKGROUND[1]

Plaintiff Miller was placed into the Restrictive Housing Unit at Montana State Prison from October 17 to November 1, 2024, pending a hearing and then after being found guilty of fighting by Defendant Walsted. (Doc. 57 at 1 – 2.)

[1] The following facts are undisputed. Factual disputes will be discussed below as needed.

Miller's claims in his Third Amended Complaint arise from the procedures by which he was determined guilty of an infraction, and the conditions under which he was held during this period.

Defendant Baltezar was the Restrictive Housing lieutenant and unit manager while Miller was held in Restrictive Housing. (Doc. 56 at 10.) As a result, Miller has named Baltezar as the defendant on Miller's conditions of confinement claim, which relates to several aspects of his detention in Restrictive Housing. The details of the exact conditions are disputed, but generally speaking, there were several issues with Miller's cell. During this time, the unit was undergoing major maintenance projects, including computer systems upgrades, roof repair, and door controls replacement. (Doc. 56 at 10.) There were also boiler problems causing a lack of hot water. Miller did not have his glasses from October 17 to 26. The lights, air circulation, and heating in Miller's cell did not work properly, due to systemic problems in the unit. Miller did not have as many warm showers as he asserts he was entitled to. Miller did not have as much time out of his cell as he was entitled to. Miller was cold in his cell. One night, Miller slipped in the dark while using his toilet and injured his knee. Miller places these issues at the feet of Defendant Baltezar.

Miller's contentions related to his disciplinary proceedings are the basis of his claims against Defendant Walsted, who was responsible for his disciplinary

procedure. On October 17, Miller was in an altercation with another inmate, which is why he was moved to prehearing confinement in Restrictive Housing; he was then written up for a major disciplinary infraction, fighting with another inmate. Miller was served with the write-up for his infraction sometime late on October 17 or in the morning of October 18. He proceeded to a hearing late on the morning of October 18. Miller's claims regarding his hearing are that he did not receive sufficient time before the hearing to prepare, and he was not able to view the evidence relied on in his hearing. Miller concludes these issues violated his due process rights.

Miller also alleges that Walsted retaliated against Miller for his exercise of his First Amendment rights, related to his requests for information. This claim is somewhat convoluted and none of it is undisputed, so it will be discussed in further detail below.

Miller's motion for partial summary judgment seeks judgment on Claims Three and Four of his Third Amended Complaint, i.e., his due process claims against Walsted related to his hearing. (Doc. 42 at 7 – 8.) (The motion specifically seeks judgment on those two claims, though Miller's brief discusses his conditional of confinement extensively. (Doc. 46 at 3 – 7.)) Defendants move for summary judgment on the entirety of Miller's Third Amended Complaint. (Doc. 54.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014). Nonetheless, the nonmoving party must identify, with some reasonable particularity, the evidence that it believes precludes summary judgment. *See Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (explaining that while pro se parties are exempted from "*strict* compliance with the summary judgment rules," they are "not exempt[ed] . . . from *all* compliance," such as the requirement to identify or submit competent evidence in support of their claims).

## III. ANALYSIS

### A. Conditions of Confinement

Miller has labeled his claim against Defendant Baltezar a "failure to protect" claim, but it is more familiarly construed as a conditions of confinement claim. (Doc. 42 at 5.) That is, Miller contends that the conditions under which he was

held in Restrictive Housing were unconstitutional, and that Baltezar was responsible. Conditions in Restrictive Housing for the two weeks Miller was there were subpar, due to mechanical issues at the prison. (Doc. 56 at 9 – 11.) Those facts are undisputed. The question, then, is whether those subpar conditions made Miller's conditions of confinement unconstitutional, and whether Defendant Baltezar was deliberately indifferent in response.

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995). But "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Farmer*, 511 U.S. at 837.

*Farmer* elaborates the standards for a convicted person's Eighth Amendment claim.

> [A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious[;]' a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities'[.] …

> The second requirement follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.' To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'

*Farmer*, 511 U.S. at 834 (citations omitted).

The objective prong of this test "requires a plaintiff to plausibly allege that it is 'contrary to current standards of decency for anyone to be . . . exposed against his will' to the relevant hazard," that is, that the resulting risk is not "one that 'society chooses to tolerate.'" *Hampton v. California*, 83 F.4th 754, 766 (9th Cir. 2023).

As to the subjective element, a prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Id.,* at 839.

1. Miller was not subjected to unconstitutional conditions

Miller's brief in support of his motion identifies the unconstitutional conditions as inadequate lighting, ventilation and temperature, no outdoor exercise, inadequate plumbing in the form of cold showers, and lack of glasses. (Doc. 46 at 4 – 7.) Under certain circumstances, especially long-term deprivation, these

conditions taken together could become unconstitutional. However, Miller was subjected to some of these conditions for fifteen days, at most, and considerably less for others. When considering the conditions of confinement, the court considers the amount of time to which the prisoner was subjected to the condition. *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (*abrogated on other grounds by Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024)); *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005).

The undisputed facts show that Miller was not subjected to conditions "'sufficiently serious[;]' or a denial of 'the minimal civilized measure of life's necessities'[.]"[2] *Farmer*, 511 U.S. at 834. Miller's assertions include that he only had four cold showers during those two weeks, when he was entitled to six, he only had five two-hour exercise sessions outside his cell, he did not have shoes, and he was cold in his cell. (Doc. 61 at 3.) He did not have his reading glasses for nine days, and his cell was dark for approximately twelve hours per day during these two weeks. None of these conditions, endured for at most fifteen days, created an "excessive risk" to Miller's health or safety or amounted to cruel and unusual punishment.

"Deprivation of outdoor exercise violates the Eighth Amendment rights of

---

[2] There are some disputed facts regarding these conditions, such as whether the showers were actually cold, but these disputes are construed in Miller's favor, as the non-moving party.

inmates confined to *continuous and long-term* segregation." *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (emphasis added). Not all deprivations of outdoor exercise are per se unconstitutional. *Norbert v. City & City. Of San Francisco*, 10 F.4th 918, 928-32 (9th Cir. 2021). "[A] temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997); *see also Norwood v. Vance*, 591 F.3d 1062, 1070 (9th Cir. 2010) (recognizing that temporary denial of outdoor exercise with no medical effects is not a substantial deprivation). Miller has identified no medical effects from receiving less than his full allotment of exercise during a two-week period. (Doc. 56-13 (records of cell-side medical and mental health visits from his time in Restrictive Housing, reporting no problems).)

"'Adequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (citations omitted). Miller had twelve hours per day of adequate light, during the fifteen-day period he was in Restrictive Housing. It is undisputed that the lights in the unit were and would have been turned off, by policy, for eight hours each night. (Doc. 56 at 10.) The amount of ambient light in the cell during that time is disputed. Defendant Baltezar stated there was light coming in from the common area outside the cells and from a narrow window at the back to the outside. (Doc. 56 at 11; Doc. 56-5 at 3 - 4.) Miller's declaration says the cell was "virtually dark"

for twelve hours per day. (Doc. 62 at 2.) Whatever the exact degree of light in the cells at night was, the conditions were not unconstitutional.

The Eighth Amendment also guarantees adequate heating. *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *see also Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) (per curiam) (noting that the Eighth Amendment requires adequate heating, but not necessarily a "comfortable" temperature). "One measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses 'a substantial risk of serious harm.'" *Graves*, 623 F.3d at 1049 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Miller has not identified any facts to show that the temperature he was subjected to was more than merely uncomfortable.

Miller had only four showers in two weeks, which may be less than he preferred or the three per week in prison policy, but that is not a condition that put him at excessive risk of harm. Not having his reading glasses for nine days likewise does not create a substantial risk of serious harm. Miller states in his declaration that the light, heat, and air situation was causing him nausea and headaches. (Doc. 46-1 at 2.) His medical records, however, show that he complained of headaches related to his assault and his glasses. (Doc. 46-2 at 84; Doc. 56-11 at 11 (saying he was kicked in the head, causing a headache).) He was seen by medical staff repeatedly through his fifteen days in Restrictive Housing, including for his knee, and he did not state to them that he was having nausea and

headaches due to cell conditions. (Doc. 56-13.)

In sum, though Miller's conditions of confinement in Restrictive Housing were less than ideal, there are no material disputes to show that the conditions were below the threshold of acceptable for a fifteen-day period, or that Miller was denied "the minimal civilized measure of life's necessities". *Farmer*, 511 U.S. at 834.

2. Baltezar was not deliberately indifferent.

Even if the conditions above had posed a serious risk to Miller's health or safety, the undisputed facts show that Baltezar did not know of and disregard an excessive risk to Miller. Miller grieved various of the above conditions during his time in Restrictive Housing. Miller filed five informal resolution forms between October 18 and November 1, while he was in the unit. (Doc. 56 at 7.) He received responses to all of these and continued with the formal grievance procedures. Defendant Baltezar was not the respondent on all of these grievances, nor was he always responsible for the situations Miller was grieving. The responses to these grievances demonstrate that Baltezar, to the extent he was involved, was attempting to remedy the problems. (*See, e.g.*, Docs. 56-7; 56-10 at 4; 56-11 at 4, 9, 10, and 13; 56-12; 56-15; 46-2 at 72 – 73, 85, and 86.)

The deposition of Baltezar demonstrates that he was not personally responsible for or capable of fixing the lighting situation, the heat, the water

temperature, the computer systems, or the other mechanical issues in the unit. (Doc. 56-5.) Baltezar was not always privy to the responses to Miller's grievances provided by other staff. Baltezar was communicating with the prison maintenance staff as well as the outside contractors regarding various conditions in Restrictive Housing with the boilers and electricity. (Doc. 56-5 at 6 - 7.) Baltezar was also new to the grievance procedure and took some time catching up with the paperwork. (Doc. 56-5 at 13.) The undisputed facts show that Baltezar's conduct or responses were not, in fact, indifferent to Miller's concerns, but rather, he attempted to remedy the problems he was aware of and had authority to remedy. (Doc. 56-17; 46-2 at 67.)

Miller does not proffer evidence to dispute that Baltezar was making efforts. Instead, he faults Baltezar for not moving Miller to a different cell. (Doc. 61 at 4 – 5.) The parties disagree about whether Miller asked to be moved, and whether there were other cells available. But Baltezar testified that Miller would not be moved for institutional reasons. (Doc. 56-5.) Having concluded that Miller was not held under unconstitutional conditions, the existence of other cells is not meaningful. Cell placement is the exact kind of administrative prison decision that federal courts are advised not to wade into. *Shorter v. Baca*, 895 F.3d 1176, 1189 (9th Cir. 2018). Whether moving him would have made his time in Restricted Housing more comfortable is not a question the Court must answer. The fact that

Baltezar did not move Miller does not raise a material fact that shows deliberate indifference. Miller has not established that Baltezar intentionally disregarded a serious risk to his health.

**B. Disciplinary hearing procedure**

Miller's allegations are that Walsted violated his due process rights, because his hearing did not comply with prison regulations that required 24-hours' notice of his charges, and an opportunity to review the evidence used against him prior to the hearing. (Doc. 46 at 8.) The facts are undisputed that Miller did not receive 24 hours' notice. Miller states that he received the notice at 9:30 p.m. the night before the hearing. (Doc. 47 at 4.) Defendant Walsted testified in her deposition that Miller verbally waived the 24-hour notice requirement prior to his hearing. (Doc. 56-1 at 5.) Miller disputes that he did. (Doc. 62 at 3; 46-1 at 3.) In any event, the hearing proceeded by late morning on October 18, less than 24 hours after he received his notice of infraction. It is also undisputed that Miller did not receive all of the documents used in his hearing. Walsted testified that she did not give him the documents prior to his hearing. However, these disputed facts are not material. Miller is only entitled to specific due process requirements if he has a liberty interest to protect. In this case, he did not.

Miller's briefing focuses heavily on Montana prison policies and whether they were violated. (Doc. 46 at 1 – 2; 8; Doc. 61 at 10, 12.) But violations of state

regulations, without more, do not rise to the level of constitutional violations. *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009). To prove that Walsted violated his due process rights regarding his hearing, Miller must "must demonstrate that he has been deprived of a protected liberty or property interest by arbitrary government action." *Ward v. Ryan*, 623 F.3d 807, 813 (9th Cir. 2010) (internal quotation marks and alterations omitted). State-created liberty interests "[are] generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Id.* at 485. In *Sandin*, the Supreme Court found no liberty interest protecting against a 30-day assignment to segregated confinement because it did not "present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486. In contrast, in *Wilkinson v. Austin*, 545 U.S. 209, 221–24 (2005), the Supreme Court concluded that indefinite solitary confinement that disqualified an inmate from parole did give "rise to a liberty interest").

The Ninth Circuit considers the following factors: "1) whether the

challenged condition 'mirrored th[e] conditions [of] administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (quoting *Sandin*, 515 U.S. at 486). Evaluating these three factors here results in the conclusion that Miller's time in Restrictive Housing did not create a liberty interest for Miller or give rise to a due process claim.

First, the conditions under which Miller was held comported with the prison's discretionary authority. There was nothing significantly different about his conditions than the regular administrative segregation conditions, other than the temporary inconveniences described above. Miller's conditions were not an atypical, significant deprivation. Miller contends that the conditions he was confined under were, in fact, "atypical." (Doc. 61 at 7.) But his use of the term is not the same as how it is construed in *Sandin*. That is, in an ordinary sense, Miller's conditions in Restrictive Housing were atypical, because the boiler was broken, etc., and those are not the usual day-to-day conditions. But his detention for 15 days in Restrictive Housing, itself, was not any kind of "atypical, significant deprivation" that gave rise to a liberty interest and a due process claim.

Second, he was only subject to the segregation for fifteen days. The Ninth

Circuit previously held that such a short sanction does not meet the *Sandin* standard necessary to create a liberty interest. *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010).

And finally, Miller's disciplinary confinement will not "invariably affect" the duration of his sentence. Miller is serving a life sentence. He may at some point be eligible for parole, but this disciplinary episode is unlikely to affect the duration of his sentence. The undisputed material facts entitle Defendant Walsted to summary judgment on Miller's due process claim.

**C. Retaliation**

Miller asserts that genuine issues of material fact preclude summary judgment on his retaliation claim against Walsted. (Doc. 61 at 7.) Miller's allegations regarding retaliation are bit confusing. Miller was previously disciplined in 2021, by a hearings officer other than Walsted. He subsequently sought to review a document related to his hearing, and Walsted would not provide it to him. He now claims that his prior request for information from Walsted in 2021 created some reason for her to retaliate against him at his hearing in 2024. (Doc. 42 at 6 – 7; 61 at 8.) He states that during his 2024 hearing, she told him "she had already warned [Miller] about asking to view evidence," and if he continued asking, he would receive a major infraction. *Id.* Thus, Miller alleges, Walsted retaliated against him for exercising his First Amendment rights to

participate in his hearing, to file grievances, request notice, and view evidence used in his hearing. (Doc. 42 at 7.)

In the prison context, a "viable claim of First Amendment retaliation" must contain the following five "basic elements":

> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Grenning v. Key*, 189 F.4th 886, 898 (9th Cir. 2026) (citing *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).) Evaluation of these factors establishes that Defendant Walsted is entitled to summary judgment on Miller's retaliation claim.

Miller's allegation is that Walsted threatened him for asking for documents and standing up for himself. The threat is the adverse action, which allegedly made Miller "afraid to make further requests or file another grievance" regarding the hearing evidence. (Doc. 42 at 7.) Miller's sole support for his contention that she retaliated against him is a grievance response from Walsted from 2023. (Doc. 46-2 at 98; Doc. 47 at 6.) This speculation is insufficient.

A prisoner must "allege specific facts showing retaliation because of the exercise of prisoner's constitutional rights." *Frazier v. Dubois*, 922 F. 2d 560, 562, n. 1 (9th Cir. 1990). To establish causation, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (internal

quotation marks omitted). The plaintiff must show a nexus between the adverse action and the protected conduct. See *Huskey v. City of San Jose*, 204 F. 3d 893, 899 (9th Cir. 2000). "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

Walsted testified that she held no animus towards Miller. (Doc. 56-1 at 15.) She has known Miller for 15 years. She treated him the same before and during the hearing as she would treat any inmate. The transcript of the hearing refutes Miller's contention and supports Walsted's. (Doc. 56-4.) There likely were discussions prior to starting the recording that are unavailable, and that is when Miller alleges the threat took place. But Walsted's conduct throughout the hearing is respectful to Miller, she allows him to speak and argue for his position, and she describes why she is finding him guilty. She listens when he disagrees with her, and she more than once suggests he can make those arguments again on appeal. Nothing about her conduct in the hearing suggests that she was retaliating against him for having asked to see evidence, especially not for having done so years before.

Impermissible retaliation "would chill or silence a person of ordinary

firmness from future First Amendment activities," and the harm must be "more than minimal." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Robinson*, 408 F.3d at 568 n.11) Whatever Walsted said did not chill Miller's speech. He subsequently appealed his discipline, arguing the very same grounds that he claims he claims Walsted denied. (Doc. 46-2 at 99.) He also filed another lawsuit against Walsted. *Miller v. Walsted, et al.*, CV 26-57-M-SPW (D. Mont., Aug. 4, 2026.) Though an inmate only needs to establish that a threat would chill a "person of ordinary firmness", Miller's allegation is not credible. She did not do what she allegedly threatened, write him up for asking to see documents, and he did not stop filing grievances, appeals, and lawsuits. There is simply no way to construe Walsted's actions as having any plausible affect on Miller's exercise of his First Amendment rights.

Finally, performing her role as the hearing officer is part of Walsted's duty, and she clearly has interpreted that duty to include not giving certain disciplinary documents to inmates. (Doc. 56-1.) Regardless of whether she was correct in her interpretation of the prison policy, the Ninth Circuit has held that "preserving institutional order, discipline, and security are legitimate penological goals that, if they provide the motivation for an official act taken, will defeat a claim of retaliation." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994). Courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation

of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt*, 65 F.3d at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). Walsted conducted the disciplinary hearing procedure as she understood it and is entitled to summary judgment on Miller's retaliation claim.

**D. State Law Claims**

Because Defendants are entitled to summary judgment on Miller's federal claims, the Court declines to exercise its supplemental jurisdiction over Miller's state law claims. 28 U.S.C. § 1367.

> "[A] district court "may decline to exercise supplemental jurisdiction" in three specific situations: (1) if the supplemental claim "raises a novel or complex issue of State law"; (2) if the supplemental claim "substantially predominates" over the claims within the court's original jurisdiction; and (3) if the district court "has dismissed all claims over which it has original jurisdiction." In all those contexts, federal law is not where the real action is. So although supplemental jurisdiction persists, the district court need not exercise it: Instead, the court may (and indeed, ordinarily should) kick the case to state court."

*Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 31–32 (2025). Having awarded summary judgment to Defendants on Miller's federal claims, the Court declines to address Miller's state law claims.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's motion is denied.

Accordingly,

**IT IS HEREBY ORDERED**:

1. Defendants' motion for summary judgment is **GRANTED**. (Doc. 54.) The Clerk of Court is directed to enter judgment pursuant to Fed. R. Civ. P. 58.

2. Miller's motion for partial summary judgment is **DENIED**.

DATED this 24th day of November, 2026.

Donald W. Molloy, District Judge
United States District Court